NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

IN RE DEPENDENCY AS TO K.F.

No. 1 CA-JV 24-0200

FILED 02-25-2025

Appeal from the Superior Court in Maricopa County
No. JD536123
The Honorable Ronee Korbin Steiner, Judge

**AFFIRMED**

COUNSEL

Robert D. Rosanelli, Attorney at Law, Phoenix
By Robert D. Rosanelli
*Counsel for Appellant Father*

Arizona Attorney General's Office, Tucson
By Jennifer R. Blum
*Counsel for Appellee Arizona Department of Child Safety*

---

**MEMORANDUM DECISION**

Presiding Judge Michael J. Brown delivered the decision of the Court, in which Judge D. Steven Williams and Judge Daniel J. Kiley joined.

---

**B R O W N**, Judge:

¶1          Clyde F. ("Father") appeals the juvenile court's order finding his daughter dependent.  For the following reasons, we affirm.

## BACKGROUND

¶2          In 2011, Father was convicted of armed robbery and aggravated assault and was sentenced to ten years' imprisonment in Georgia.  In 2022, Father was arrested in California, where he now lives, for unlawful possession of a firearm by a convicted felon.  *See* Cal. Penal Code § 29800(a)(1).  That charge remains pending.

¶3          Father and M.M. ("Mother"), who is not a party to this appeal, are the parents of K.F. ("Child"), who was born in July 2024.  Two months after Child was born, the Department of Child Safety ("DCS") removed Child from Mother's home in Arizona after reports of significant domestic violence between Mother and her boyfriend.  DCS also took temporary custody of a second child that Mother and her boyfriend have together.

¶4          Kim (a pseudonym) agreed to let Mother and the two children live with her, and DCS implemented an in-home safety plan that required Mother and the two children to live with Kim under certain restrictions.

¶5          DCS petitioned for dependency, and as relevant here, alleged Father neglected Child by (1) failing to establish paternity or seek custody or parenting time, (2) failing to establish a parent–child relationship, and (3) being unwilling or unable to provide proper and effective parental care and control.  Father denied the allegations.  After he and Mother signed an acknowledgment of paternity, the juvenile court found Father to be Child's natural father.

¶6          In November 2024, Kim notified DCS that Mother was violating the safety plan in several ways, including bringing male strangers into the home without Kim's permission.  The juvenile court then issued an order authorizing DCS to take physical custody of Child.  DCS filed an amended dependency petition alleging Father neglected to provide proper

and effective parental care and control of Child due to domestic violence between Father and Mother. DCS also alleged that Father (1) yelled profanities at Mother and engaged in "toxic conversations" with her, (2) threatened to kill Kim, and (3) had a warrant for his arrest for felony firearm possession in California.

¶7 In December 2024, the juvenile court held a dependency adjudication hearing. The case manager testified that Mother has been diagnosed with various disorders, including anxiety, depression, and schizophrenic spectrum disorder. The case manager stated that Mother had labeled her relationship with Father as "toxic" and that he berated her and called her names. When asked whether DCS had sufficient information about Father such that Child "could be placed safely in his physical custody and the case could be dismissed," the case manager said "No," adding that the conditions of Father's home in California are unknown. When the case manager spoke with Father about the need for a background check, Father said he lived alone even though he was living with his girlfriend.

¶8 Kim testified that she heard phone conversations between Mother and Father, including an incident before Child was born when Father said, "he should kill me" and that "I was nothing but a B." After Father's threat, Kim moved to another apartment. Mother asked to stay with Kim but later gave Father the new apartment number when she moved in. Kim also said Mother and Father argued before and after Child was born, and Mother was "scared of him" because of the way he talked to her and the way he acted.

¶9 Mother testified that she did not believe Child would be safe under Father's care, because Mother barely knows him, saying "I met him only one time at the mall, and we were friends, and then I ended up getting pregnant by him." She explained that she did not want Child to go to California with Father, noting Father's girlfriend had threatened Mother in phone calls and texts before Child was born, including telling Mother that "she wished [Mother] could die and things like that." When asked if Father had done anything to stop the girlfriend's behavior, Mother responded that he actually "leads it on." Mother explained that she has no interest in having a relationship with Father but does not oppose safely co-parenting with him.

¶10 Father testified that he never engaged in domestic violence with Mother and that he regularly visited Child after she was born for three months until DCS became involved. DCS had not yet allowed him any visits, but Father expressed his willingness to travel to Arizona for

supervised visits. Father currently works full-time in California and stated he was willing to care for Child. He explained that when he is working, Child could be cared for by his mother or sister, who live about fifteen to twenty-five minutes away, or by his girlfriend, who lives with him, even though none of them have interacted with Child. Father added that his girlfriend is willing to accept Child, and that his girlfriend's issue is not with Child but with Mother.

¶11 At the conclusion of the hearing, the juvenile court found that DCS failed to prove domestic violence between Father and Mother, but it granted DCS's request to amend its petition to conform to the evidence. Father does not challenge that amendment on appeal. The court also noted its serious concerns with Father's behavior that could place Child in harm's way. The court explained that Father's release from prison was followed by his alleged commission of a weapons offense, and when considered in context with the threat made to Kim and cussing out Mother, reflected that Father "has either impulsivity control issues, and/or anger control issues, that under the circumstances and given the fact that this child is of such a young and vulnerable age, that it creates significant concern . . . enough to warrant a finding of dependency."

¶12 In its written ruling, the juvenile court found the allegations of the amended petition were proven by a preponderance of the evidence. The court explained that Kim "persuasively testified" that Father "made a threat . . . that he would kill her," causing her "significant fear" and that his criminal history, considered "in context with the above behavior towards Mother and [Kim], support a finding of dependency." The court concluded that given Father's uncontrolled anger or impulsivity issues, which place Child in an unsafe situation without appropriate oversight, he neglected Child and was unable or unwilling to provide her with proper and effective parental care and control. Father timely appealed, and we have jurisdiction under A.R.S. § 8-235(A).

## DISCUSSION

¶13 Father argues the juvenile court's dependency order is clearly erroneous and unsupported by the evidence. We review the court's ruling for an abuse of discretion, *Louis C. v. Dep't of Child Safety*, 237 Ariz. 484, 488, ¶ 12 (App. 2015), viewing the evidence in the light most favorable to sustaining the juvenile court's findings, *Willie G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 231, 235, ¶ 21 (App. 2005). The juvenile court is in the "best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Ariz. Dep't of Econ. Sec. v. Oscar O.*,

209 Ariz. 332, 334, ¶ 4 (App. 2004). We accept the court's factual findings "if reasonable evidence and inferences support them" and we will affirm the court's legal conclusions "unless they are clearly erroneous." *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478–79, ¶¶ 30–31 (2023). Legal conclusions are clearly erroneous only if, as a matter of law, "no one could reasonably find the evidence" supporting them meets the applicable burden of proof. *Id.* at 479, ¶ 31.

**¶14** A child is dependent if they are "[i]n need of proper and effective parental care and control" and without a parent who is "willing to exercise or capable of exercising such care and control." A.R.S. § 8-201(15)(a)(i). One basis for a dependency finding is neglect, which includes the "inability or unwillingness of a parent . . . to provide that child with supervision, food, clothing, shelter or medical care if [it] causes substantial risk of harm to the child's health or welfare." A.R.S. § 8-201(25)(a). DCS has the burden of proving a dependency by a preponderance of the evidence. A.R.S. § 8-844(C)(1).

**¶15** Father disputes the juvenile court's finding that he "neglected and is unwilling or unable to provide proper and effective care and control by exposing [Child] to anger issues and/or impulsivity issues" and that Child had been placed in "an unsafe situation." Father also argues the record provides no support for the court's finding that he has uncontrolled anger and impulsivity issues.

**¶16** Father first points to the court's finding that Father cursed at Mother during conversations, and that their relationship is toxic. He contends that "cussing out" Mother does not mean he neglects Child or that such conduct causes an unreasonable risk of harm to Child's health or welfare. He also takes issue with the court's failure to elaborate on the "toxicity" of his and Mother's relationship. Father directs us to Mother's testimony, where she said that "[e]verybody has disagreements," and that she and Father have arguments about "dumb stuff." But Mother described their relationship as toxic, and she testified that he would berate her, call her names, and cuss her out. This evidence, coupled with evidence discussed below, could reasonably lead the juvenile court to conclude that Father's behavior towards Mother placed Child in an unsafe environment.

**¶17** Father cites an article from *Psychology Today*, which addresses the characteristics of a "toxic relationship," to support his view that Mother's relationship with Father lacks those characteristics. Father's citation to the article does not comply with applicable rules for preparing appellate briefs, nor does the record indicate that the article, or the

characteristics it discusses, were presented to the juvenile court. *See* Ariz. R. P. Juv. Ct. 607(b) (incorporating ARCAP 13(a)(7) (arguments on appeal must be supported by "citations of legal authorities")); *Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 234, ¶ 14 n.6 (App. 2011) (failure to develop argument usually results in abandonment and waiver of issue). Even so, the court's references to cussing and toxicity must be viewed in context with the rest of the court's findings and the entire record, which establish that the dependency determination was not made based on a single factor or event, but a combination of circumstances showing that Father has neglected, and he is unwilling or unable, to safely parent Child.

**¶18** Father also challenges the court's finding that he threatened to kill Kim, claiming she did not say she heard a direct threat that he was going to kill her. Relying on *In re Kyle M.*, 200 Ariz. 447 (App. 2001), Father argues his statement was not a "true threat" because he did not "aggressive[ly] confront[]" Kim. However, *Kyle M.* involved whether threatening behavior satisfied the element of a crime, which involves considerations unique to criminal law and requires a higher burden of proof than what we are addressing here. *Id.* at 451, ¶ 21 (describing a "true threat" as a defendant's statement to another person who reasonably interprets the statement as a serious expression of an intention to kill or inflict bodily harm).

**¶19** The court found Kim's testimony—that Father threatened to kill her—"reliable and persuasive," and the threat caused her "significant fear." Though Father disputes that finding, we do not reweigh the evidence on appeal. Father did not physically confront Kim like what happened in *Kyle M. See id.* at 452, ¶ 24 (noting that the defendant grabbed the victim's wrist and "told her to keep quiet about their prior conversation or he would kill her"). Even so, Kim heard Father's statement that he wanted to kill her, which led her to take further actions for self-protection, including moving to a different address. Reasonable evidence supports the court's finding that Father's threat to kill Kim thereby placed Child in unsafe circumstances.

**¶20** Father also argues that neither his criminal convictions nor his pending criminal charge supports a finding of neglect because those offenses do not involve child abuse or neglect. But Father cites no authority suggesting a parent's criminal record must directly correlate with child abuse or neglect in weighing whether a legal basis for dependency has been established. And because the juvenile court considers the circumstances existing at the time of adjudication, Father's prior convictions and his pending felony charge may be relevant factors for the court to consider in

deciding whether he is *currently* capable of exercising proper and effective parental care and control. *See Shella H. v. Dep't of Child Safety*, 239 Ariz. 47, 50, ¶ 12 (App. 2016) ("[T]he court must determine whether a child is dependent based upon the circumstances existing at the time of the adjudication hearing."); *see also Willie G.*, 211 Ariz. at 235, ¶ 21 (recognizing the juvenile court's broad discretion in dependency cases because the primary consideration is the child's best interests).

**¶21**      Noting Father's pending felony charge, the case manager expressed concern whether Father would be incarcerated. Although Father did not believe his pending criminal charge would lead to jail or prison time and that probation or even dismissal was possible, he had not communicated with his criminal defense attorney or received any information other than an upcoming court date. The juvenile court acted within its discretion in concluding that Father's recent criminal conduct after serving a ten-year prison sentence was a serious concern.

**¶22**      Finally, Father argues that because there was no testimony or records presented by a psychologist or counselor, the evidence "does not support the court's opinion that [he] has anger and impulsivity issues." But Father cites no authority requiring expert testimony to prove such issues. Thus, given the testimony of Kim and Mother, the juvenile court could properly find that Father has anger and impulsive behavior problems without hearing from a psychologist or counselor.

**¶23**      The evidence outlined above, and the reasonable inferences derived from that evidence, support the juvenile court's finding of dependency based upon Father's neglect and unwillingness or inability to provide Child with proper and effective parental care and control.

**CONCLUSION**

**¶24**      On this record, we affirm.

